## AYER v. SEYMOUR et al.

*(Common Pleas of New York City and County, Special Term. May 27, 1889.)*

1. CORPORATIONS—STOCKHOLDERS—EVIDENCE.

In an action to enjoin defendants from selling or voting on certain shares of stock in a corporation, plaintiff alleged that such stock belonged to her. It appeared that the corporation was organized to manufacture certain articles in accordance with formulas owned solely by plaintiff, and all the shares of stock were issued to plaintiff, who was made president, and plaintiff testified that she transferred a part of the stock to defendant S., as collateral security for a loan of money to be used in the business. S. testified that the stock was transferred to him absolutely, in consideration of his services as director and manager of the corporation, and in procuring money to carry on the business. S.'s son testified that plaintiff had delivered the shares of stock to him, with instructions to give them to his father in consideration of services to be rendered by the latter, and two other witnesses testified that immediately on the organization of the corporation plaintiff affirmed that the specified amount of stock "belonged" to S. Plaintiff denied the statement of S.'s son, and denied other admissions testified to by defendants' witnesses. The statements of S. and his son as to the amount of the stock transferred to him differed from the amount named in the certificate. On a former suit against the corporation, S. had testified that he was not a stockholder, and had no financial interest in the corporation, but he testified on this trial that when he so swore he had pledged his stock. S. had fraudulently obtained entrance to plaintiff's house during her absence, and carried away some of her private papers, which he did not produce, simply deny-

ing that he took the papers as alleged by plaintiff. Plaintiff's physician testified that he allowed S. to examine plaintiff's papers in his possession, on S.'s producing a written order purporting to be signed by plaintiff, but which plaintiff testified she had not given. S. did not deny that he inspected the papers, but denied that he produced the order. *Held*, that the weight of evidence was that plaintiff owned the shares of stock, and had transferred them to S. in pledge.

**2. SAME—INJUNCTION.**

It appeared that the stock of the corporation, while very valuable, had no market value, as it had not been sold in the market. Including the stock pledged to S., 498 shares, plaintiff owned 968 shares out of a total of 1,000. S. had transferred the 498 shares to his son's wife, who was plaintiff's daughter, and by this means plaintiff was excluded from the management of the business. There was proof that S. and his son, who had control of the business, and who were parties defendant, had conspired to keep plaintiff out of the country, and away from her business, by sending her false telegrams, and suppressing genuine telegrams to her, by reporting that she was insane, and by abstracting papers, etc. *Held*, that an injunction would be granted and a receiver *pendente lite* appointed.

**3. SAME—PARTIES.**

The son's wife, who holds the 498 shares of stock in her own name, will be included in the injunction, though she was not served with summons and complaint, nor with the injunction and motion papers.

On motion to continue an injunction, and for the appointment of a receiver.

*Stephen H. Olin* and *Austen G. Fox*, for plaintiff.  *Roger A. Pryor* and *E. H. Cahill*, for defendants.

DALY, J.   The plaintiff seeks to enjoin the defendants from selling or transferring and from voting upon certain of the shares of stock of the Recamier Manufacturing Company, and asks that a receiver be appointed to take and hold such shares during the pendency of this action. The grounds of her application are that those shares belong to her, and were pledged with the defendant James M. Seymour as security for a loan of $50,000 made by him to her; that Seymour, who was a stock-broker, was engaged in certain transactions for her benefit in the purchase and sale of stocks, which transactions, as he reported from time to time to her, resulted in profits which he applied in reduction of said loan until it was almost or wholly repaid in or about the month of August, 1888; that in November, 1888, Seymour, who was the assistant treasurer of the company, and his son, the defendant A. Lewis Seymour, who was the treasurer, without her knowledge and consent, and in pursuance of a conspiracy to deprive her of such shares, and to exclude her from the management of the company, she being the president, canceled the certificate of said shares, and issued a new certificate to the defendant Harriet T. Seymour, who is the wife of A. Lewis Seymour, and the daughter of the plaintiff, and who paid no consideration for such stock, and took it with full knowledge of plaintiff's title thereto.

In support of her claim the plaintiff sets forth that prior to April, 1887, she was engaged in the manufacture of certain proprietary articles known as the "Recamier Toilet Preparations," in accordance with certain recipes and formulas which were her sole property; that at said date the Recamier Manufacturing Company was incorporated at the suggestion of defendant James M. Seymour, with a capital stock of 1,000 shares at $50 each, all of which were issued to the plaintiff for the purchase of her said recipes, trade-marks, and business. She advanced $7,000 to the company as working capital, and also put into its treasury the $50,000 borrowed as aforesaid from James M. Seymour. She gave to him a certificate for 498 shares as collateral security for said loan, and indorsed the certificate in blank. She transferred 1 share to A. Lewis Seymour, his son, and 1 share to Albert Watson, and 30 shares to one Mrs. Mason. The balance, 470 shares, has always remained her property. She was elected president of the company, and A. Lewis Seymour treasurer, and they, with Watson, were elected trustees for the first year. In May, 1888, she was taken ill at her residence, No. 120 West Thirteenth

street, in this city, where she lived with her daughter Harriet, who was then and was for nearly two years engaged to be married to defendant A. Lewis Seymour. In June, 1888, the plaintiff was removed to her summer residence at Montclair, N. J., where she remained ill until October, 1888, when she returned to this city. During the said months, May and June, the defendant Seymour and his son, as she complains, began their conspiracy to obtain control of the company, and to exclude her from the exercise of her functions as president, and to obtain possession of her stock. In the said month of June a meeting of the trustees of the said company was held, without notice to her, and they elected James M. Seymour as assistant treasurer of the company. On November 12, 1888, her daughter was married to A. Lewis Seymour. On November 22d the transfer of the 498 shares held by James M. Seymour as security was made to Harriet by her father-in-law and her husband, without plaintiff's knowledge and in fraud of her rights. In December, 1888, the plaintiff sailed for Europe to visit her younger daughter, a child of 12 years, who was residing in Stuttgart, in charge of a Miss Howard. Before and after her departure for Europe, and while she was ill, she charges that the Seymours, father and son, caused to be administered to her dangerous drugs for the purpose of destroying her health and incapacitating her from managing her affairs, and that they reported that she was insane. While she was in Europe, with the design of preventing her return to America, they sent false telegrams to her, falsely informing her that her daughter Harriet was about to join her there, and also fabricated and sent to her a telegram purporting to come from an old friend, one Grubb, and also suppressed a telegram from one Henry T. Thomas, which he intrusted to A. Lewis Seymour to send her; also that during her absence, and in December, 1888, James M. Seymour obtained access to her residence in New York by fraud, and abstracted therefrom certain papers of hers, among them being his own letters and writings, which she possessed as evidence of the payment of the said loan of $50,000, and a certain cipher paper containing the secret of her manufactures; also that James M. Seymour fraudulently signed the name of the plaintiff to an order on one Dr. Pinkham, of Montclair, by which he obtained and examined certain of her letters; and also, in February, 1889, he, or his son, A. Lewis Seymour, wrongfully obtained from the post-office and kept two letters posted to the plaintiff, and addressed to her at the Clarendon Hotel, N. Y.

The plaintiff charges that Albert Watson, the aforesaid trustee of the company, is and has been for years a clerk of the defendant James M. Seymour, and is wholly under his control; and that between May and October, 1888, over $20,000 was drawn from the treasury of the company by A. Lewis Seymour, and debited to the account of the plaintiff, of which some part was applied to her use, but no account thereof was ever rendered to her; and that no meeting of the board of trustees of the company has been held since April, 1887, except the alleged meeting of June, 1888; and that no meeting of the stockholders has ever been held, notwithstanding the by-laws provided for a meeting on May 1st of each year. It is also alleged as ground for the equitable interference of the court that the stock of the company is of great value, but that no share has ever been sold in the market, and that it has no market price; also that the transfer of the 498 shares to the defendant Harriet will enable defendants to destroy plaintiff's title to her stock, and render ineffectual any judgment she may recover, and exclude her from her rightful share in the control and management of the company, and thus injure its business and credit, and impair the value of the stock.

The proof with respect to these charges must now be examined, and, first, as to the plaintiff's claim that the 498 shares were delivered to the defendant James M. Seymour as collateral security, and not otherwise. The plaintiff swears to it positively. The defendant James M. Seymour denies it. He

swears that she offered and agreed to give him one-half of the capital stock of the company in consideration of his services in organizing the company, and as manager and director of its affairs, and of his procuring sufficient money to run the business; that this was before its incorporation; that he had previously lent her large sums of money for use in the manufacturing business, which had before that date, as he says, been conducted at a loss; and that she consulted him in regard to carrying it on, and he proposed the formation of the corporation in order to extend the business, and proposed to advance the requisite capital, as she had not sufficient money; that after the company was organized she transferred to him one-half of the capital stock in accordance with her agreement, and the said stock was held by him as his own property, in consideration of his said services and of such loans of money as he might be required to make; that he thereafter procured a loan of $50,-000 from "one C. S. Seymour" to the company, and that he held the 500 shares of the stock until November 17, 1888, when he transferred, out of natural love and affection, 498 shares to his daughter-in-law, the defendant Harriet, and that he gave the remaining two shares, one to Watson and one to his son. He denies making any speculation in the stock market for plaintiff, and making any report thereof to her, or any statement that the loan had been almost or entirely repaid.

A. Lewis Seymour swears that on April 9, 1887, the plaintiff delivered to him 500 shares, with instructions to deliver the same to his father in consideration of certain services to be rendered by the latter to the company, and that his father held said shares until November 17, 1888, when he transferred them to deponent's wife; that he has frequently heard the plaintiff refer to the shares as the property of his father; that previous to his marriage the plaintiff told her daughter that she would give her as many shares from her half interest in the company as she (Harriet) could induce James M. Seymour to give her from his half interest; and that plaintiff has frequently stated that the said James M. Seymour could make a large amount of money out of his interest in the company. James W. Fox swears that immediately upon the organization of the company he told the plaintiff that he was instructed by James M. Seymour to say to plaintiff that he was entitled to 500 shares, and to request her to sign in blank a certificate for that amount; that she did so, after affirming that that amount of stock belonged to said Seymour. Albert Watson swears that the plaintiff, in his presence, delivered 500 shares to A. Lewis Seymour, saying: "Give this to your father; it belongs to him." Charles H. Stone swears that the plaintiff told him on April 9, 1887, that the company had been organized, and that she had "signed all the papers and taken her share of the stock and got out, or words to that effect." Peter Bodine swears that the plaintiff frequently told him that in the course of time the company would be, and she desired it to be, the property of her daughter Hattie and her husband. With respect to this latter statement, it would seem that the probabilities are against the accuracy of the witness's recollection. Mrs. Ayer had then and now another child, who would be cut off by such a disposition of her property, and no reason for this intention or resolution is shown. But as to the statements of Fox and Watson concerning the delivery of the certificate, and her declaration that it belonged to James M. Seymour, these are as consistent with her claim as with his, for, even if the stock were to be his as pledgee, it belonged to him. The plaintiff denies that she offered or agreed to deliver to James M. Seymour half the capital stock for his services, or for procuring loans for the company. She denies the statement of A. Lewis Seymour as to what was said when she delivered the shares to him. And she points out a significant inaccuracy in the affidavits of his father and himself in stating that 500 shares were to be delivered, or were actually delivered, to the former; referring to the stock certificate to show that 498 shares only were delivered to him. And she affirms that she, and

not James M. Seymour, gave to A. Lewis Seymour and to Watson each his one share. She also denies the other statements or admissions testified to by the other witnesses for the defendants.

The decision as to what was the agreement upon which the shares were to be transferred by her to James M. Seymour—whether they were to be his property or were to be held as security only—must mainly rest upon the degree of credit to be given to her testimony as opposed to his, for the agreement was made between them without the presence of any other persons, so far as the affidavits show. James M. Seymour swears that the shares were to be his property, and he says that he held them from their delivery in April until November, 1888, when he transferred them to his daughter-in-law. The plaintiff claims that he is impeached by certain testimony given by him in October, 1888, in an action in the city court, wherein the Giles Lithographic Company was plaintiff and the Recamier Manufacturing Company was defendant. It appears that he was a witness in that case for the defendant, and in order to affect the value of his testimony he was cross-examined as to his interest in the company. He was asked if he had any financial interest in the concern, to which he answered, "No." He was asked if he was a stockholder, and he also answered, "No." This appears from the minutes of the trial of the action produced before me. Upon this testimony being read, James M. Seymour has made an additional affidavit to explain it. He swears that on or about April 17, 1888, he procured from his wife, Mrs. Caroline S. Seymour, a loan of $50,000 to the company, and pledged the 498 shares of stock to her as security for that loan; and that on November 17, 1888, he induced her to deliver him the shares in order that he might make them a present to their daughter-in-law, and that when he swore in the action in the city court that he was not a stockholder it was because the stock was then held by his wife as pledgee, and was not in his name on the transfer book. This explanation does not relieve the defendant. Even if he had pledged the stock, his testimony was not true that he had no financial interest in the company, and was not a stockholder. The plaintiff charges that his explanation is an afterthought. No affidavit in support of it is made by his wife. In his first affidavit he mentioned that he had procured the loan of $50,000 from "one C. S. Seymour," but did not state that this was his wife, nor did he state that he had pledged the shares with her. On the contrary, he swore that he had held the shares up to the time he transferred them to his daughter-in-law, leaving the impression that he had not parted with them during any part of that time. He is thus confronted with conflicting statements made by him under oath at different periods in respect to his ownership of the stock, and this is so, whatever construction is to be placed upon his affidavits. The plaintiff is entitled, on this hearing, to claim the benefit of this impeachment of his veracity, and, upon the direct issue between the parties, I feel bound to hold that her unimpeached testimony must, as the case now stands, outweigh his denial.

This conclusion is strengthened by the attitude of James M. Seymour with respect to the serious charge that he fraudulently obtained access to the plaintiff's house while she was absent in Europe, and carried away writings, among which were his own communications to her respecting the payment of the loan of $50,000, for which the stock was pledged with him. The plaintiff swears that those papers were in two trunks or boxes, and part of them in a closed leather bag, which was placed in a closet, the door of which was locked. She went abroad in December and returned in February. On her return she went to her house, and found that the leather bag had been cut open, and was empty, and that the letters of James M. Seymour, and papers referring to the state of the plaintiff's account, and other papers of value, including the cipher relating to the formulas for manufacturing, were missing. Her cook and laundress, Amelia Queen, who was left in charge of the house, swears that a week after plaintiff's departure Seymour called, and said that

plaintiff had arrived in Paris safely, and had left some important papers here which she wanted him to send immediately to her, and had cabled him to come and get them; he was given a tin box, from which he took one paper. Two or three weeks afterwards he returned to the house, and went up to plaintiff's bedroom, remaining there some time. After he had left, the cook went to the room, and found the closet which had been locked by her, and the key taken out, open, and many papers scattered on the floor and on the bed. She told the plaintiff's daughter, Mrs. Harriet Seymour, of this when the latter shortly afterwards called. Mrs. Seymour said that Mr. Seymour had no right to open that closet, as he knew perfectly well what her mother's wishes were in regard to her private papers. James M. Seymour does not deny that he went to the house as stated, and made the false representations to obtain access to the papers, as alleged, nor that he searched among the papers of the plaintiff, and took and carried away certain of them. He contents himself with swearing that he never broke open and took from any closet, bag, or trunk belonging to the plaintiff any formulas, recipes, or cipher code, nor any vouchers or receipts or records of any business transactions between deponent and plaintiff, or between deponent and any other person or persons, or between plaintiff and any other person or persons. This denial is merely a negative pregnant. It is not a denial that he took away in a manner described certain papers. This extraordinary admission of gaining access to plaintiff's papers by fraud, (for he does not produce the alleged cable message, nor say that he ever had plaintiff's permission to search among her papers,) of examining such papers, and of abstracting what he wanted therefrom, maks it apparent that he is deterred by no scruples, and renders such positive denials as he does make of the least possible weight. Against a party who makes away with evidence, all presumptions are to be indulged in. He does not produce the paper or papers taken away. We are therefore at liberty to presume that if they were produced they would not corroborate him nor sustain his version of the transactions. Of a like character with the act of fraudulently gaining access to the plaintiff's papers, and abstracting one or more therefrom, is also his act of procuring the inspection of letters written by the plaintiff to her physician, Dr. Pinkham, of Montclair, N. J. Dr. Pinkham attended the plaintiff from June 25 to November 15, 1888, she having been placed in his care by Dr. George F. Shrady, of New York. After the departure of plaintiff for Europe, Seymour came to Dr. Pinkham, and said that he came from plaintiff, who wished him to see certain letters she had written to the doctor concerning the defendant. Upon the doctor's refusal to show them, Seymour produced an order purporting to be signed by plaintiff, embodying the request. The doctor then showed the defendant the letters. The plaintiff swears that she never signed or made such an order, and never gave defendant authority to inspect those letters. The defendant does not deny that he asked the doctor to let him inspect the letters, and that he did inspect them. He denies that he ever presented an order signed or purporting to be signed by the plaintiff; but, on the question between the doctor and the defendant of accuracy of statement with regard to a matter of this kind, I should incline, for the reasons above given, to place reliance upon the testimony of the doctor.

Upon the case as presented upon the affidavits, the weight of evidence seems to be with plaintiff on the question of the ownership of the 498 shares of stock in dispute. The plaintiff has the right to an injunction restraining the transfer or incumbering of the stock, and to restrain the holder from voting thereon, if it be shown by facts or circumstances tending to justify the conclusion that there is danger of injury to plaintiff's property, inadequacy of legal remedy, or any pressing or serious emergency or other special ground of jurisdiction. *McHenry* v. *Jewett*, 26 Hun, 453, 90 N. Y. 58.

This leads to a consideration of the evidence to support the allegations of

plaintiff in that regard.    It has already been shown that the stock of the company, although of great value, has no market price, not having been sold in the market.    This alone is sufficient to give a court of equity jurisdiction of an action to compel the transfer of such stock, and to enjoin the defendants from conveying or incumbering it, because the plaintiff has no adequate remedy at law.    Having acquired jurisdiction for that reason, the court may grant any relief appropriate upon the facts, where special circumstances are shown of peculiar injury to the plaintiff.    The defendants upon such proof may be enjoined *pendente lite* from so conveying or incumbering, and also from voting upon, the stock.    The circumstances detailed in plaintiff's papers are intended to show that defendants conspired together to deprive her of the shares in dispute, and to prevent her from exercising control over the company to which she is entitled as owner of a majority of the stock, (968 shares out of 1,000,) by withholding the stock, and disputing her right to the same, and to vote thereon; by causing her to leave this country and go to Europe, and while there, and before her departure, to be treated medically with dangerous drugs to the peril of her health and reason, if not of her life; and by endeavoring to prevent her from returning or being able to return, and assume the management of the affairs of the company, and of her interest therein; and that this design of the defendants was effected by the use of fraud, artifice, falsehood, the suppression of telegraphic messages, the reports of her insanity, the abstraction of papers, etc., as heretofore and hereafter detailed.    In examining the proofs upon this subject it will not be necessary upon affidavits, with the testimony of experts and others conflicting, to inquire into the truth of the charge as to the actual administration of improper drugs, or drugs, to-wit, sulfonal, in improper quantities, to the plaintiff, and as to their effect upon her.    The amount of the dose and the frequency of its administration appears from one of the prescriptions as put up, and which was produced before me, to be as alleged by the plaintiff, and thus to corroborate her maid as to the actual doses given; and the evidence of two American physicians now before me is quite positive as to the injurious effect of such treatment, thus corroborating the testimony of the maid as to the actual condition of the plaintiff after taking the remedies prescribed.    But, on the other hand, the actual doses administered, and the propriety of the treatment, are maintained by the testimony of the foreign physicians, and its beneficial effect vouched for by attendants and eye-witnesses.    The settlement of such a dispute upon affidavits is not to be expected.    The same observation applies to the suggestions of the complicity in the conspiracy of Miss Howard, the lady in whose charge the plaintiff placed herself while abroad.    The unremitting personal care bestowed upon plaintiff by her is vouched for by all the defendants' witnesses to the transactions.    The pertinent subject of inquiry is whether the defendants intended to or believed they could use Miss Howard, and the means employed in plaintiff's treatment while abroad to carry out their alleged scheme to keep plaintiff out of the country for their own purposes.    Upon this point there can be no room for doubt, the most conclusive evidence against them being furnished by the admissions of A. Lewis Seymour, and by the oath of James M. Seymour, as well as by the circumstances already detailed.

Mr. Henry T. Thomas, a gentleman of undoubted respectability, engaged in the publishing business in this city, who is acquainted with the plaintiff and defendants, swears that on January 19, 1889, he received a cable from the plaintiff, asking him to ascertain whether her daughter Harriet had sailed for Europe and by what steamer.    He went to the residence of the daughter, and was told that she was at Orange.    He cabled the plaintiff to this effect, and asked what was wanted.    The following day he received a second cable from plaintiff, saying that her daughter had telegraphed that she sailed, and that none of her (plaintiff's) messages had since been answered.    Mr.

Thomas communicated with Mrs. Seymour, plaintiff's daughter, who called upon him, and said that she was anxious to go to her mother, but could not go alone, as her husband might be detained by an important lawsuit. Shortly afterwards her husband, A. Lewis Seymour, arrived, and stated that his lawsuit had been postponed for two weeks, and he could not leave until it was finally disposed of. Mr. Thomas thereupon wrote the following reply to the plaintiff: "Nobody sailed; Lewis detained fortnight by adjourned lawsuit; Hattie wants to come, but cannot go alone; written." This message was agreed upon by Seymour and his wife as a proper answer to send, and Seymour proposed to send it, to which Mr. Thomas demurred, saying he would send it himself; but afterwards, upon Seymour's persisting and promising to send it just as it was written, Mr. Thomas gave it to him. This telegram was never received by the plaintiff, as she swears, nor does A. Lewis Seymour say that he sent it, or deny Mr. Thomas's affidavit. Mr. Thomas further swears that he told A. Lewis Seymour that if plaintiff were ill and wanted her daughter it would seem to be the daughter's duty to go; that Seymour replied that plaintiff was not seriously ill; that she had been suffering from insomnia, and imagined a great deal, but that she was "taking sulfonal" with excellent effect, and would, if she continued the treatment a few days more, be entirely cured; that they were kept fully advised by Miss Howard, under whose care she was, as to her condition; and that there was no real need for the daughter going abroad. Mr. Thomas asked him if he knew Miss Howard, and Seymour replied: "Yes; we know her well, and she is a person we can depend on." He then took Mr. Thomas aside, and said that plaintiff was not really ill physically, and gave Mr. Thomas to understand that she was not mentally responsible, and that for such reason no reliance could be placed upon anything she said or did, and they agreed that if it were true it would be a kindness to put plaintiff under proper restraint. On a subsequent interview with A. Lewis Seymour, Mr. Thomas showed him a letter received from plaintiff, in which she stated, among other things, that it was her intention to return home at once. Seymour then asked Mr. Thomas to see him alone, and they retired to another room, where Seymour then stated to Thomas that plaintiff was going to appeal to him and to Mr. Olin, her lawyer, to help her; that he (Seymour) did not want her to return home, and that if she did he should not allow his wife to see her. He asked Mr. Thomas if he had ever heard of the trouble about the stock-book, and said that plaintiff, before going abroad, had accused him of tampering with the stock-book of the company, and of stealing $7,000 of her money, but he had succeeded in convincing her before she went away that she was mistaken. He continued that plaintiff had not been seriously ill at all, but had feigned illness; that her mind was not right; that Dr. Shrady had pronounced her case hopeless; that she had given extravagant orders for goods, stating the circumstances; that she had a a magnificent business, and one which would be very valuable "to her children and her grandchildren" if properly cared for, but that she was utterly unfit to give it proper attention, and if left on her hands it would go to pieces. Mr. Thomas asked him if he had sent his cable message precisely as it had been written, and Seymour replied that he had done so. At a subsequent interview Mr. Seymour told Mr. Thomas in a confidential way that he didn't think plaintiff would return for a good while, as he "had taken care of that." Mr. Thomas asked him how, and he replied that he had done so by sending a cable in the name of another person, asking her to await this person in Paris. Mr. Thomas asked him whose name, and Seymour replied that he could not tell, but at a moment later added that he might as well do so; that he had signed the cable, "GRUBB;" that General Grubb was an old friend of the plaintiff, and that she would undoubtedly await his coming; that he thought this was "very cleverly done," and that he hadn't told anyone about it, not even Hattie. He also said that it had been announced in the Paris edition of

the Herald that the plaintiff and her daughter Margaret were about to leave for Italy. Mr. Thomas asked him if this might not be true, and Seymour replied he thought not, as Miss Howard would not allow the daughter out of her care; that Mr. Thomas then asked, "Why not?" and whether plaintiff did not herself place Margaret in Miss Howard's care. Seymour replied, "Yes." Mr. Thomas said that such being the case plaintiff was free to demand her own daughter back. Seymour replied that Miss Howard would "fight like a wolf" before giving up Margaret, and that with the doctors on her side plaintiff would have a very hard time getting possession of Margaret. The defendant A. Lewis Seymour does not deny these statements of Mr. Thomas, nor refer in any way whatever to his interview with Mr. Thomas, although he has made on this motion two affidavits with respect to other matters pertinent to the issues. The defendant James M. Seymour, on the other hand, swears that the plaintiff went to Europe at his earnest solicitation to place herself under the care of eminent physicians in Europe, for the purpose of being cured of certain nervous disorders brought on by the excessive use of morphine and alcoholic liquors, and that he did write certain letters to the plaintiff with a view to prevent her returning to this country, as he had been informed from time to time that she had not sufficiently recovered from her said disorders to make it wise for her to engage in any business, but that he was "of necessity forced to employ some *finesse* to accomplish this object," and that the said *finesse* was employed only for the good of the plaintiff.

This evidence clearly establishes, as I have said, that the defendants James M. Seymour and his son, A. Lewis Seymour, were engaged in the effort to keep the plaintiff out of the country, and away from the management of the business, which was entirely in their hands and under their control. It is charged by the plaintiff in an action which, as president of the Recamier Manufacturing Company, she commenced against the defendants Seymour at the same time as the bringing of the present action, (*Manufacturing Co.* v. *Seymour, ante,* 648,) as showing that the defendants' exclusion of her from the business and keeping her away from it was intended to enable them to effect private ends of their own; that in March, 1889, James M. Seymour drew, or caused to be drawn, from the treasury of the company, the sum of about $28,000, and during the month of April, 1889, the further sum of about $7,000, without authority of law, and in violation of his duties as trustee, and in fraud of the plaintiff's rights. It is also shown that after, the commencement of that action in the name of the company by the plaintiff, the defendant A. Lewis Seymour, with Watson, as trustees of the company, convened a meeting of the trustees of the company, and directed the said action against themselves to be discontinued, and employed counsel for that purpose. Without inquiring into the merits of the charges made in that action, (although no denial of the facts is presented on behalf of the defendants Seymour,) the special circumstances detailed justify the equitable relief asked for in this action, and the continuance of the injunction granted herein, as well as the appointment of a receiver. The plaintiff has shown satisfactorily that of the 1,000 shares of the stock of the company she is the owner of 968, while the defendant A. Lewis Seymour owns but one share, and the defendant James M. Seymour none; that she is excluded from the management of the company by the claim set up by them to the 498 shares, and by the transfer of such shares by them to the defendant Mrs. Harriet Seymour; and that injury is to be apprehended to the plaintiff's stock and interests by the alleged acts of the defendants James M. Seymour and his son, to which I have referred.

The defendant Mrs. Harriet Seymour has not been served with the summons and complaint, nor with the injunction and motion papers; but there is no difficulty in holding, under the proofs, that she is so united in interest with the other defendants, and chargeable with knowledge that the stock trans-

ferred to her by them was her mother's property, as to justify her being included in the injunction, so that it may not be ineffectual; the stock standing in her name, and she having the apparent right to vote thereon, and to transfer or incumber the same. The injunction is continued, and a receiver *pendente lite* will be appointed; $10 costs of motion to plaintiff.